UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| NATHAN GODFRIED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Docket No. 1:19-cv-00372-NT |
| ) | |
| FORD MOTOR COMPANY, ) | |
| ) | |
| Defendant. ) | |

**ORDER ON DEFENDANT'S MOTION TO DISMISS**

Before me is the Defendant's motion to dismiss the Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) (ECF No. 39) and an accompanying memorandum of law ("**Def.'s Second Mot.**") (ECF No. 40). For the reasons stated below, the motion to dismiss is **DENIED**.

**BACKGROUND**

Plaintiff Nathan Godfried, a Maine resident, alleges that he was struck by the protruding sickle blade of a Rear Attached Mower Series 501 Component 14-92 (the "**Mower**") while riding his bicycle in Passadumkeag, Maine, in August 2013. Compl. ¶¶ 1, 6 (ECF No. 1). The Plaintiff contends that this freak accident was caused by a defect in the Mower, which he alleges was manufactured by the Defendant, Ford Motor Company ("**Ford**"), between 1955 and 1966. Compl. ¶¶ 3, 6.

After the Plaintiff filed suit in this Court, the Defendant moved to dismiss the case for lack of personal jurisdiction ("**Def.'s First Mot.**") due to the lack of a "causal nexus between Ford's contacts in Maine and Plaintiff's cause of action." Def.'s First

Mot. 1 (ECF No. 18). The Defendant argued that jurisdiction could only lie in Maine if the Plaintiff could prove that the Mower was designed, manufactured, or first sold in Maine. Def.'s First Mot. 7–8.

## I. The Rear Attached Mower Series 501 Component 14-92 and Its Connections to Maine

As a result of the Defendant's motion, the parties engaged in jurisdictional discovery, and the Defendant produced a corporate representative, Erich Kemnitz, for a deposition. Dep. of Erich Kemnitz ("**Kemnitz Dep.**") (ECF No. 41-1). Mr. Kemnitz had little information to offer. He knew that Ford manufactured its tractors and farming implements at three factories in Europe and two in Michigan, but he did not "know anything specific relative to the[se] . . . manufacturers relative to each other." Kemnitz Dep. 16:12–20. He did not "know the specifics of which commodities were built and shipped where for each individual plant." Kemnitz Dep. 17:1–3. He did not "know which specific plant would have manufactured" the Mower, nor did he know where any Rear Attached Mower Series 501 Component 14-92 (the "**501 Mower**") was manufactured. Kemnitz Dep. 17:5–12. He did not "know the specific organizational structure on how the [501 Mowers] were sold," including whether Ford had any wholesalers with which it worked in Maine during the relevant timeframe. Kemnitz Dep. 26:2–5, 17–18. He did not know the sales history of the Mower. Kemnitz Dep. 16:5–11. He did not have any information regarding the sales numbers for any 501 Mower sold between 1956 and 1965. Kemnitz Dep. 13:5–18. He did not know what television or radio marketing Ford may have conducted in Maine for the 501 Mower. Kemnitz Dep. 29:11–15. And while he was aware that there existed an

informational brochure for the 501 Mower, Mr. Kemnitz did not know whether it was distributed within Maine. Kemnitz Dep. 29:11–15. Mr. Kemnitz was also unable to offer any information about Ford's record retention policies. Kemnitz Dep. 14:17–15:3. Because of the dearth of information provided by the Defendant, it is not only unknown where the Mower was first designed, manufactured, or sold, but where *any* 501 Mower was designed, manufactured, or sold.

Mr. Kemnitz also did not seek to gather any of the information that he lacked. He was provided documents by the Defendant but did not locate any himself. Kemnitz Dep. 10:12–16, 11:2–8. He conducted no research. Kemnitz Dep. 11:2–8. And he did not reach out to anyone who sold Ford's agricultural products at any time in the last sixty years. Kemnitz Dep. 26:20–23.[1]

Despite not being able to gather any design, manufacturing, or sales information from the Defendant, the Plaintiff has produced some information pertaining to the Defendant's advertising of its rear mowers in Maine, although these advertisements do not specifically mention the 501 Mower. The Plaintiff has gathered from the University of Maine archives seven advertisements for the Defendant's tractors, rear mowers, and other farming implements in *Farm Journal* magazine between April 1957 and May 1960. Aff. of Natasha E. Pomroy ("**Pomroy Aff.**") ¶¶ 3–4, Exs. 1A–1G (ECF No. 41-2). Some of these advertisements extolled the virtues of buying a Ford tractor because of the "wide assortment of Ford . . . tools" that could be

---

[1] Ford sold its tractor and agricultural division in the late 1980s or early 1990s. Dep. of Erich Kemnitz, 27:3–5.

attached to the tractor (not unlike today's KitchenAid stand mixer), including a rear mower. Pomroy Aff. Exs. 1B, 1E. Others encouraged the reader to go to "your"—sometimes further personalized as "your local" or "your nearby"—Ford tractor dealer. Pomroy Aff. Exs. 1C, 1E–1G. And another described the Defendant's mowers as being "America's largest selling!" Pomroy Aff. Ex. 1D. As evidence that *Farm Journal* was circulated in Maine during the relevant time period, the Plaintiff offers evidence that *Farm Journal* briefly profiled two Mainers—one from Penobscot County and one from York County—in its January 1958 edition and published advertisements for a rug supplier in Portland, Maine, and a nursery in Fryeburg, Maine, in its February 1958 edition. Pomroy Aff. ¶ 5, Exs. 2A–C.

The Plaintiff has also offered evidence that the Defendant sold its rear mowers in Maine, although, again, this sales information is not specific to the 501 Mower. There was an authorized Ford Tractor dealer in Brewer, Maine, in 1956 that sold new and used tractors and various "farm implements" including "mowing machines." Pomroy Aff. Exs. 3B–3D. That franchise moved to Bangor in 1957, describing itself in a grand opening announcement as the "Headquarters for Ford Farming & Industrial Equipment." Pomroy Aff. Exs. 3E, 3F.

When a new Ford tractor dealer opened in Bangor in May 1960, it advertised that it provided "all sales and services for Ford tractors," that it "handle[d] all sizes of gas and diesel Ford tractors and farm and industrial equipment," that it served "all your needs" for Ford tractors, and that it had "a complete parts department and service shop." Pomroy Aff. Exs. 3G, 3H. That same tractor dealer advertised itself in

4

August 1960 as "Your Headquarters For All Your Needs For Ford Tractors," and in April 1961, it advertised its "Complete Line of Ford Tractors and Equipment" and its full inventory of parts. Exs. 3I, 3J.

## II. *Ford Motor Co. v. Montana Eighth Judicial District Court*

While the Defendant's motion to dismiss was pending, the Supreme Court issued a decision in two factually similar cases[2] in which it held that, in some instances, a court can assert personal jurisdiction over a defendant where there does not exist the type of "strict causal relationship" that the Defendant originally argued was lacking here. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021). One of these cases arose out of a car accident in Montana involving a Ford Explorer and the other out of a car accident in Minnesota involving a Crown Victoria. *Id.* at 1023. Both cars were designed in Michigan, the Explorer was manufactured in Kentucky and sold in Washington, and the Crown Victoria was manufactured in Canada and sold in North Dakota. *Id.*

Ford argued—just as it initially did here—that a state only has jurisdiction over Ford if its "conduct in the State had given rise to the plaintiff's claims," meaning that Ford had "designed, manufactured, or—most likely—sold in the State the particular vehicle involved in the accident." *Id.* Because neither plaintiff could make that showing in the two cases at issue, Ford argued that neither Montana nor Minnesota could assert personal jurisdiction over it in these cases. *Id.*

---

[2] Both cases—*Ford Motor Co. v. Montana Eighth Judicial District Court* and *Ford v. Bandemer*—were decided in a consolidated opinion. *See generally Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021).

The Supreme Court disagreed. The Court concluded that "Ford's causation-only approach finds no support in [the] Court's requirement of a 'connection' between a plaintiff's suit and a defendant's activities" and that "[n]one of [the Court's] precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do." *Id.* at 1026 (quoting *Bristol-Myers Squibb Co. v. Super. Ct.*, 127 S. Ct. 1773, 1776 (2017)). Rather, in some cases, specific jurisdiction can attach "when a company like Ford serves a market for a product in the forum State and the product malfunctions there." *Id.* at 1027.

In the wake of *Ford*, the parties filed supplemental briefing. The Defendant's supplemental brief ("**Def.'s Suppl. Br.**") acknowledges, as it must, that its original causation argument is insufficient to carry the day. *See* Def.'s Suppl. Br. 4 (ECF No. 46). However, the Defendant tries to limit *Ford*'s reach, contending that that "decision hinged upon Ford's advertising and marketing of the specific vehicle models at issue, and those vehicle models' sales at numerous Ford dealerships within the forum states," information that the Defendant argues is lacking here. Def.'s Suppl. Br. 4. The Plaintiff, on the other hand, contends that *Ford* "is dispositive of Defendant's motion" and that "[i]t is sufficient for jurisdictional purposes that Defendant both marketed and sold in Maine agricultural equipment, including the type of mower at issue here." Pl.'s Suppl. Br. 1 (ECF No. 47).

**LEGAL STANDARD**

On a motion to dismiss under Rule 12(b)(2), the plaintiff bears the burden of establishing that the forum state may exercise personal jurisdiction over the

6

defendant. *Kuan Chen v. U.S. Sports Acad., Inc.*, 956 F.3d 45, 54 (1st Cir. 2020). A district court has several methods that it can use to evaluate whether a plaintiff has met its burden. *Id.* at 51. Under the first method, the prima facie approach, " 'the district court acts not as a factfinder, but as a data collector,' asking only whether the plaintiff has proffered facts that, if credited, would support all findings 'essential to personal jurisdiction.' " *Id.* (internal citations omitted) (quoting *Foster-Miller, Inc. v. Babcock & Wilcox Can.*, 46 F.3d 138, 145 (1st Cir. 1995)). This is the approach "most commonly employed in the early stages of litigation." *A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58 n.5 (1st Cir. 2016) (quoting *Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81, 83–84 (1st Cir. 1997)).

"If the court determines that it would be unfair to the defendant to proceed with the litigation without first requiring the plaintiff to make more than a prima facie showing of jurisdiction, the preponderance-of-the-evidence approach comes into play." *Kuan Chen*, 956 F.3d at 51. "Under that approach, the district court holds 'a full-blown evidentiary hearing at which the court will adjudicate the jurisdictional issue definitively before the case reaches trial' using a preponderance-of-the-evidence standard." *Id.* (quoting *Foster-Miller*, 46 F.3d at 146). And the third method, which also necessitates an evidentiary hearing, is appropriate in the "special circumstances" when "the assertion of jurisdiction is bound up with the claim on the merits." *Id.* at 52 (quoting *Foster-Miller*, 46 F.3d at 146). The choice of which of the three methods to use "is informed chiefly by the state of the record, the extent to which the merits of the underlying claim are intertwined with the jurisdictional issue, and the district

court's assessment of whether it would be 'unfair to force an out-of-state defendant to incur the expense and burden of a trial' without first requiring a substantial showing of the facts necessary to establish jurisdiction." *Id.* at 51 (quoting *Foster-Miller*, 46 F.3d at 145–46).

Here, neither party requested an evidentiary hearing, and the state of the record lends itself best to the prima facie approach.[3] Under that approach, the plaintiff "is obliged to adduce evidence of specific facts" beyond the allegations of the complaint. *PREP Tours, Inc. v. Am. Youth Soccer Org.*, 913 F.3d 11, 16 (1st Cir. 2019) (internal quotation marks omitted). I take "the plaintiff's properly documented evidentiary proffers as true and construe them in the light most favorable to the plaintiff's jurisdictional claim." *Id.* at 16–17 (alterations, quotation marks, and citations omitted). I also consider undisputed facts that are offered by the defendant. *Id.*; *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016).

## DISCUSSION

The Defendant argues that I cannot exercise personal jurisdiction over it because "nothing affirmatively establishes that Ford actively sold or marketed the product model at issue in Maine or otherwise took efforts to create or foster a market for this particular product model within Maine." Def.'s Suppl. Br. 5. The Plaintiff, on

---

[3] The Defendant indicates that it agrees that this approach is the most appropriate one in this case. Mem. of Law in Supp. of Def. Ford Motor Co.'s Mot. to Dismiss for Lack of Personal Jurisdiction. 3–4 (ECF No. 40). The Plaintiff has not addressed what it considers to be the appropriate method. *See generally* Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss (ECF No. 41).

the other hand, contends that it has provided sufficient evidence of the Defendant's marketing and sales of agricultural equipment in Maine, including the 501 Mower. Pl.'s Suppl. Br 1.

### A.     Personal Jurisdiction Standard

There are two ways of establishing personal jurisdiction over a defendant: general or specific. *Ford*, 141 S. Ct. at 1024. Here, the Plaintiff asserts only that the Court has specific jurisdiction over the Defendant. *See* Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss 1 (ECF No. 41). Specific jurisdiction requires that "[t]he plaintiff's claims . . . 'arise out of or relate to the defendant's contacts' with the forum." *Ford*, 141 S. Ct. at 1025 (quoting *Bristol-Myers*, 137 S. Ct. at 1780).

Personal jurisdiction must meet the requirements of the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment. *See LP Sols. LLC v. Duchossois*, 907 F.3d 95, 102 (1st Cir. 2018); *Cossaboon v. Me. Med. Ctr.*, 600 F.3d 25, 32 (1st Cir. 2010). Maine's long-arm statute specifically says that "[d]oing or causing a tortious act to be done, or causing the consequences of a tortious act to occur within this State" confers personal jurisdiction. 14 M.R.S.A. § 704-A(2). Maine's statute also provides that,

> to insure maximum protection to citizens of this State, [this section] shall be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the United States Constitution, 14th amendment.

*Id.* § 704-A(1); *see also LP Sols.*, 907 F.3d at 102. Under the Due Process Clause, a court may "exercise jurisdiction over an out-of-forum defendant only if, with respect to the claims at issue, the defendant has 'certain minimum contacts with the forum

such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *PREP Tours,* 913 F.3d at 17 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); *accord Ford*, 141 S. Ct. at 1024.

To establish specific jurisdiction, the plaintiff must show "an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Ford*, 141 S. Ct. at 1025 (quoting *Bristol-Myers*, 137 S. Ct. at 1780). The First Circuit applies a three-part test to determine whether this "minimum contacts" requirement is met. *PREP Tours,* 913 F.3d at 17. First, the plaintiff's claim must be sufficiently related to the defendant's in-forum activities; second, the defendant must have purposefully availed itself of the privilege of doing business in the forum state; and third, assertion of jurisdiction over the defendant must be reasonable. *Scottsdale Cap. Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 20 (1st Cir. 2018).

**B.     Application**

As the Defendant recognizes, this case is all about the first part of the minimum contacts analysis—whether Ford's in-forum activities are sufficiently related to the Plaintiff's claim. The Defendant's briefing as to specific jurisdiction is entirely focused on arguing that its contacts are not sufficiently related to Maine. *See* Def.'s Second Mot. 1, 6–9; Def.'s Suppl. Br. 4–5. I thus conclude that the Defendant has conceded purposeful availment and the reasonableness of the assertion of

jurisdiction, and I consider any argument to the contrary to be waived. *See United States v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990).[4]

Because the minimum contacts analysis requires that the plaintiff's claim arise out of *or* relate to the defendant's contacts with the forum, in some cases, a state may assert jurisdiction over a defendant as a result of "another 'activity or occurrence' involving the defendant that takes place in the State." *Ford,* 141 S. Ct. at 1026 (quoting *Bristol-Myers,* 137 S. Ct. at 1780–81). And this includes some instances "when a company like Ford serves a market for a product in the forum State and the product malfunctions there." *Id.* at 1027.

The Defendant contends that *Ford*'s finding of specific jurisdiction is limited to a situation where a defendant "market[s] and sell[s] *the specific vehicle models at issue* in the forum state[ ]." Def.'s Suppl. Br. 1–2; *accord id.* at 4 ("[T]he Court's decision hinged upon Ford's advertising and marketing of the specific vehicle models at issue, and those vehicle models' sales at numerous Ford dealerships within the forum states . . . ."). I disagree that *Ford* is as limited as the Defendant reads it to be.

It is true that *Ford* explicitly declined to address a situation where a company has not marketed the product at issue in the forum state. *See Ford,* 141 S. Ct. at 1029. And it is true that *Ford* focused most acutely on Ford's Montana and Minnesota contacts in the context of the Explorer and Crown Victoria models. *See id.* at 1028.

---

[4] Indeed, it is difficult to imagine that a nationwide company like the Ford Motor Company could seriously argue that it has not purposefully availed itself of the market of any state or that the assertion of jurisdiction by any state would be unreasonable. *Cf. Ford,* 141 S. Ct. at 1022 (pointing out that Ford's "business is everywhere" and that it "annually distributes over 2.5 million new cars, trucks, and SUVs to over 3,200 licensed dealerships" nationwide); *id.* at 1028 ("Small wonder that Ford has here conceded 'purposeful availment' of the two States' markets.").

11

But this is unsurprising. When issuing a decision, a court "normally decide[s] only questions presented by the parties." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (internal quotation marks omitted); *see Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 324 (1936) ("The judicial power does not extend to the determination of abstract questions."). Thus, because *Ford* only involved the Explorer model's contacts with Montana and the Crown Victoria model's contacts with Minnesota, the Supreme Court did not need to decide definitively the extent of the relevance of Ford's contacts to the forum outside of the contexts of these two vehicle models.

      Nevertheless, while the Court took pains to emphasize that it was not deciding the bounds of specific jurisdiction for products that are not marketed nationwide, it was equally careful about describing the extensive contacts that Ford has with the Minnesota and Montana vehicle markets, even outside of the specific models at issue in the case. *See Ford*, 141 S. Ct. at 1022–23, 1029–30. I find this significant, and I understand this to mean that it is not *necessarily* a prerequisite for specific jurisdiction that a company market or sell the specific product model at issue in the forum state. *Cf. id.* at 1027 ("[T]his Court has stated that specific jurisdiction attaches . . . when a company like Ford serves a market for a product in the forum State and the product malfunctions there."). Specific jurisdiction can still attach where the defendant's contacts are only marginally more attenuated. Thus, in the context of the case before me, in evaluating the extent of Ford's contacts with Maine, I consider not

only Ford's marketing and sales of the 501 Mower in Maine, but also Ford's marketing and sales of rear mowers in Maine generally.[5]

The Plaintiff has offered enough evidence to meet its relatively modest burden to proffer sufficient facts to support jurisdiction, particularly in light of my obligation to construe all of the Plaintiff's properly documented evidentiary proffers in the light most favorable to him.[6] The Plaintiff's evidence shows that *Farm Journal* advertised

---

[5] It is not clear to me why it should make a difference whether Ford marketed the Rear Attached Mower Series 501 Component 14-92 (the "**501 Mower**") in Maine so long as it marketed rear mowers in the forum. The parties offer no evidence to indicate that the 501 Mower is so distinct from other rear mowers as to warrant this distinction.

The Defendant appears to argue that specific jurisdiction can only be premised on the advertising and sale of a product if the *exact* type of product was advertised or sold in the forum state. That is not a fair reading of *Ford*. *Ford* discussed the in-forum sales of Explorers and Crown Victorias generally, not just the sales of the specific type of Explorer or Crown Victoria involved in the accidents at issue. That lack of specificity is telling. It made no difference to the Supreme Court whether the allegedly defective Explorer in Minnesota was an Explorer King Ranch or an Explorer XLT, or whether it had leather seats or a sunroof. For the Court's purposes, all of Ford's Minnesota contacts involving Ford Explorers were relevant.

The parties offer no evidence as to how rear mowers are classified and whether the 501 Mower is more akin to a Ford Explorer generally or an Explorer King Ranch specifically. The fact that the Plaintiff's advertisements do not specify *any* particular type of rear mower gives rise to the inference that requiring an advertisement of the 501 Mower specifically (like the Explorer King Ranch) would require the Plaintiff to prove a greater connection to the forum state than the personal jurisdiction analysis demands. I construe this inference in the light most favorable to the Plaintiff, as I must, and conclude that just as the Supreme Court treated all of Ford's Minnesota contacts involving Ford Explorers to be relevant data points, all of Ford's Maine contacts involving rear mowers are relevant here.

[6] While I find that the Plaintiff has produced sufficient evidence of Ford's contacts in Maine to support the exercise of personal jurisdiction, I recognize that there is significant evidence that is lacking here, such as information about the sales of 501 Mowers in Maine. While it is the Plaintiff's burden to produce evidence in support of jurisdiction, it is not lost on me that this evidence is likely difficult to obtain from a source other than the Defendant. And because of the Defendant's failure to provide such evidence in discovery here, it is unsurprising that these questions remain unanswered. This is in stark contrast to a case like *Ford*, for example, where it was clear where the specific vehicles involved in the accident were designed, manufactured, and sold. In at least one of the cases consolidated in *Ford*, this information was developed during jurisdictional discovery. *See Bandemer v. Ford Motor Co.*, 931 N.W.2d 744, 757–58 (Minn. 2019) (Anderson, J., dissenting), *aff'd sub nom. Ford*, 141 S. Ct. 1017. And at least some of this information came from the testimony of a Ford design engineer. *See id.* at 759 (Anderson, J., dissenting).

To be clear, I do not accuse the Defendant of withholding relevant information. I recognize that the information that the Plaintiff sought is from decades ago and that it is possible that Ford did not retain the information. But the Defendant's failure to provide the Plaintiff with virtually any information about the 501 Mowers that it designed, manufactured, marketed, or sold during the

13

Ford's rear mowers between 1957 and 1960, and some of these advertisements encouraged prospective buyers to go to their local Ford dealers. The Defendant dismisses this evidence, arguing (1) that the identified advertisements "are generic and not specifically targeted to Maine," (2) that the advertisements do not specifically identify the 501 Mower, and (3) that the "Plaintiff cannot establish that *Farm Journal* was circulated in Maine during the relevant time period." Ford's Reply to Pl.'s Opp'n ("**Def.'s Reply**") 8 (ECF No. 42); *accord* Def.'s Suppl. Br. 4–5. I fail to see the relevance of the first argument, and the second, as I explained above, is similarly beside the point. As for the Defendant's third argument, the Plaintiff's evidence that two Mainers were profiled in *Farm Journal* and that two Maine businesses advertised in the same during the relevant time period is sufficient evidence that *Farm Journal* was circulating in Maine. I question how businesses would know to advertise in the magazine (or why they would want to) if the magazine was not

---

relevant time period leaves the Plaintiff in the same troublesome spot, regardless of the reason for this dearth of information.

The Plaintiff has not asked me to draw an adverse inference as a result of the Defendant's nonproduction, *see Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 20 (1st Cir. 2009) ("[A]n adverse inference instruction may be allowed when a party fails to produce a document that exists or should exist and is within its control."), so I do not do so. But it is troubling to me that the Defendant's 30(b)(6) witness had such little knowledge about the salient issues and that it appears that he did little to acquire such knowledge as he was required to do. *See* Fed. R. Civ. P. 30(b)(6) ("The persons designated must testify about information known or reasonably available to the organization.").

This information void has real consequences. Under Ford's theory in this case, Ford could potentially control where it is sued solely based on which records it decided to keep about its products. If Ford chose not to retain records about a particular product—and thus it is not knowable where that product was designed, manufactured, marketed, or sold—it would be the rare case that Ford could be sued *anywhere* outside of its place of incorporation or its principal place of business—that is, the places where it is "essentially at home." *See Ford*, 141 S. Ct. at 1024 (internal quotation marks omitted). And were Ford to move its operations abroad, Ford's theory appears to lead to the conclusion that it might not be able to be sued anywhere in the United States. I do not interpret the Supreme Court's jurisprudence to allow a defendant to manipulate the levers of personal jurisdiction to such an extent.

14

available in Maine. This evidence was not rebutted by the Defendant, and so I must credit it.[7]

The Plaintiff has also put forth evidence that authorized Ford dealers advertised and sold rear mowers in Maine in the late '50s and early '60s. And in construing this evidence in the light most favorable to the Plaintiff, I conclude that these advertisements encompassed not only rear mowers in general but the 501 Mower in particular. One authorized dealer in Maine characterized itself as the "Headquarters for Ford Farming & Industrial Equipment," and I see no reason why Ford's "Headquarters for . . . Farming . . . Equipment" would not sell the 501 Mower. Another Ford dealer in Maine advertised how it served "all your needs" for Ford tractors and how it sold the "Complete Line of Ford Tractors and Equipment." I take these advertisements at their word and understand them to mean that they sold all Ford rear mowers, to include the 501 Mower.

In addition, like the Supreme Court, I find it significant that Ford encouraged the targets of its advertising (which I conclude included Mainers) to shop at their "local dealer" and that the Plaintiff's evidence shows that Maine dealers marketed their expansive parts departments and service shops as being able to attend to "all [the customer's] needs." *Cf. Ford*, 141 S. Ct. at 1029 (explaining that customers may buy Ford vehicles precisely because of Ford's contacts where they live, even if they buy the vehicles out of state). It makes sense that someone in the market for a rear

---

[7] While the Defendant does not have the burden of proof, the Defendant was free to put forth evidence that *Farm Journal* was not available in Maine or to establish that any of the inferences that the Plaintiff has drawn are not justified.

15

mower "may take into account a raft of Ford's in-state activities designed to make [using] a Ford [product] convenient there," such as "that Ford dealers stand ready to service the [mower]." *See id.*

The Plaintiff has offered enough evidence of Ford's marketing and sales of rear mowers in Maine during the relevant time period to establish that Ford's Maine contacts are sufficiently related to the rear mower accident underlying this suit for personal jurisdiction to attach.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendant's Motion to Dismiss (ECF No. 39).

SO ORDERED.

/s/ Nancy Torresen  
United States District Judge

Dated this 6th day of May, 2021.